Council for appellate please proceed. Thank you, your honors. May it please the court Martin Stanley for the appellant in this case. And I apologize, I have a little bit of a throat problem, hopefully not COVID. But who knows, I hope everyone as well. This is the second time as your honors know that we've been up before this court, this honorable court. The first time there was no doubt that the issues that are now brought before this case were already briefed in the answering brief of the defendant that was filed originally in this court. And therefore, we would suggest that when you look at this case overall, that the decision of the court originally to send the case back must have included either by express or implication, the same very same issues that were cited in this case. And there are cases for example, it didn't, it didn't by express language, did it? It did not. But by implication, I would suggest that it had to have otherwise why would the court send it back to simply waste time based on the same record to have another judge look at it again, and all of a sudden say, Oh, now I'm sorry, we've decided that you don't have a case. In fact, the same this court, the new court that took this case, contrary to the mandate of the court, or the court in the original decision stated that without the benefit of a hearing or oral argument raises real doubts as the case as to the care with which Mia's plans were examined. The court below again, decided this case without oral argument or a hearing. I mean, how much clearer can the Ninth Circuit be about the possibility that that at the very least was violated by the court below? Now that's point number one. So I would suggest based on several cases that are cited on our opening brief, that first of all, we shouldn't even be having to be here again, unfortunately, bringing these cases again, this case again, briefing these cases, this case again, etc. Number two, if you look at the decision of the Ninth Circuit and the findings, it was not just some simple little problem with this case. There were substantial findings by the Ninth Circuit in this case, direct talking about the difficulties and the error that took place by the original court below. For example, the court, the Ninth Circuit stated that there were genuine issues regarding the identification, including whether the detectives asked leading questions during witness interviews, whether the witnesses earlier testimony contradicted later identifications, and whether the defendants failed to identify Mia's alibi. Second, the court also said there were substantial issues as to whether the photographic lineups were unduly suggested. So these issues show that there are substantial issues that should have been decided according to the Ninth Circuit by trial by jury. Instead, we're back again without a trial by jury. And if you look at the decision by the court in the second summary judgment hearing, I'm very concerned, we're very concerned, because if you really look at it, the judge is saying no reasonable jury could find genuine issues regarding the identifications, including whether the defendants asked leading questions during witness interviews, etc., etc., and whether or not their photographic lineups were unduly suggested. I don't think that's what the district court, the second district court judge was saying here. I think the court was focused on a different issue from the one that we were dealing with the first go-around, which was the existence of probable cause. The district court rightly, I think, focused on a separate issue, which I think you concede is separate, as to whether the prosecutor made an independent judgment. Right? Okay, go ahead. I do agree it's a separate issue, but I disagree that he's really focusing on different facts, because the same facts that supported our original position would be enough to support the position that we're bringing here, which is... Let's focus on the alibi, right? Because I think that's actually the weakest part of your argument to us now. You have to make the argument, which you do, that the detectives never advised the deputy DA that your client had stated that he had an alibi, and we have a declaration from one of the detectives in deposition testimony, in which they say that no, we did. We did advise the deputy DA of that. Well, I respectfully disagree. I think the deposition testimony is conflicting. If your honors look at the citations that he cited with respect to the alibi, hold on. For example, in our supplemental papers, Detective Olley stated he did not recall telling the filing district attorney or deputy that he had not interviewed the two corroborating alibi witnesses, but intended to interview them in the future. He also said he did not remember whether he told the filing deputy at the filing meeting that he had completed his alibi investigation. So, let me ask you this. Why did you not take the deposition of the prosecutor? Well, what happened is this is 20 years later. Of course, we had him on the witness list to testify at trial. This case was taken off calendar two weeks before the trial, and the briefing on the issue of prosecutorial independence. But in the absence of his testimony, there would be at least the possibility that the presumption favorable to your opponent about the prosecutor making an independent judgment would come into play. So, why didn't you just say the judge, we can't do summary judgment until we've had a chance to pose the prosecutor. We thought we didn't need to do it because we knew he'd be a witness at trial, but now we do. Well, two things on that, your honor. Thank you for bringing that up. Number one is, first of all, we had the admission by the district office that the identification testimony was, quote, not quite accurate and is misleading. That was found by the habeas corpus petition. So, obviously, if the identification testimony, which was supposedly discussed at this one hour or less meeting where 900 pages of a murder book were presented, and we know no one reviewed that for sure because that would have been physically impossible. And where the two people, the two detectives admit that based on their oral discussions, there was a decision to file right after that meeting. We have the district attorney's office later on looking at it and saying it's not quite accurate and misleading what was provided to us. Number two, they say Detective Van der Horck was impeached at trial based on that fact that he did not provide accurate information to them. So, we do have misleading there. So, we already have enough based on that, I would suggest, to at least rebut the presumption. We don't have to completely bring in evidence that's totally ironclad. We just have to put in evidence that a jury might buy, might not buy. And when the district court below in this case says he is not bound by that, that's true, but that's not the requirement that we have to meet or the burden that we have to meet in this case. We don't have to show that he has to be bound by something. We just have to show that there's a scintilla of evidence or just enough to overcome the presumption so that we can have the jury hear that and see whether they believe that the testimony was not quite accurate and or misleading. Number two, because we didn't have an oral argument on this case, we never really had the chance to ask the judge, well, if you're really considering this, can you give us a chance to take the deposition first at least? I mean, we never really had that opportunity because we never got the oral argument that this court said that we should undoubtedly have. So, if you look at that, if you look at the DA's misleading, and if you look at the trial judge in the superior court's findings after days of hearings, that what happened there was misleading. And if you look at that and you add that in with all these deposition inconsistencies. Can you flesh out on the witness ID? There was the one person in particular who was purported to have made a positive identification. What was misleading about the presentation that the detectives made to the DA on that point? Well, first of all, they did not bring the tapes with them. So, the DA, they admit they didn't bring the tape recordings. Number two, they don't recall what they say because it's 20 years later. So, that's the problem. You see, what you're doing is by allowing this to take place the way the district court wanted to do so is you're allowing the longer time in prison, the more cases that are because you have no ability to do anything when all of a sudden you get a host of I don't remember. I was asking a slightly different question. I just wanted you to give me your argument to the jury. Like what's the presentation you're going to make to the jury if we were to reverse as to why, what is it that the DA, I'm sorry, what is it that the detectives misleadingly conveyed to the DA? Well, they failed to tell him that the tape was erased, that they retaped it, that our expert says that there was misleading questioning, that it was leading questioning, which is improper, and that the... Specifically, what, just I'm trying to get in the weeds. What is it that happened that you think was wrong in terms of what happened with the ID? Because eventually the witness, I guess, some way or another, said he was pretty certain that it was this person. So what went wrong? After, if you look at the sheet, which is on the sheet that was deposed, first, and you look at the tapes, first of all, the tape is missing of what he originally said. That's a big problem as we know. Because there's an issue as to whether or not the tape is just trashed. That always happens, or that's always a possibility, and the jury gets to decide that based on looking at the witnesses. Then number two, a new tape was had and a new was transcribed. It was more or less, and you saw, and you saw, I mean, and previously you testified, or you told us in the tape that you knew it was Mr. Mia, didn't you? Yes. And you still agree with that? Yes. I don't remember the exact... I think, for example, during the second taping, questions were put like, when you looked at this, quote, when you looked at this photographic display folder, you keyed in on an individual in one of that slots. Is that correct? And then they asked, you, quote, you had indicated earlier that you were certain that that was the shooter in this case that we're now investigating. Is that correct? So what you're saying is, first, they don't, we have this funny situation where they say the first tape was, you know, had to be destroyed because it wasn't adequate. And then they don't repeat a neutral investigation, a neutral identification process, but rather they say, ah, this is what you said, right? You were certain, right? And that's, I take it, what you're complaining about. Absolutely. And I appreciate your honor helping me out. I mean, it's an enormous record and there's a lot of things, but absolutely. And our expert detective, or Lieutenant Strong, who actually put forth the declaration mentioned most of these things in more detail than I can in my two minutes and 48 seconds that I have remaining, which I'd like to have a half an hour more, but I know I can't. But I think if you look at overall, what's happening here, there are a lot of inconsistencies. The original court said, send it back and have a trial. We still haven't had our hearing. We have a hearing before your honors, but we don't get a hearing at this district court. Does that seem right? You know, I really should reserve my two and a half minutes, unless there's an important question that I can help the court answer. I would really appreciate that. It appears not. We'll hear from the city. Good morning, your honors, and may it please the court. I think your honors are correct that this was not decided in the first summary judgment motion. The rule of mandate and the rule of the prior case law. What was not decided, counsel? The issue of the prosecutorial independence was not decided. The difficulty I have with this case is that the prior panel explicitly said that this case should be returned for an argument, for oral argument, and a hearing. And that was never done. So why isn't that a violation of the mandate? Well, I think the court was specifically referring to Judge Real and the way he decided it. It's clear that the second district court, when it looked at the issues, did make a more detailed finding. Judge Wilson did the same thing. No hearing, no argument. He did allow the parties to rebrief the issue, though. No hearing, no argument. I can't disagree with that. Why isn't that a violation of the mandate? It was clear that the panel thought that this case at least deserved a hearing and an argument. And I don't see how that's not a violation of the mandate if it goes back and is decided in the same way that the panel took issue with initially. Well, I think that might have been more directed toward Judge Real, as opposed to the, you know, because the court also in the mandate... But the mandate was directed at a new judge, because the Ninth Circuit had already decided this would go back to a new judge. So the mandate governs the new judge, does it not? Well, the mandate governs the new judge in terms of what was decided, you know, what the prior issues was decided. But I think in terms of what the court was taking issue with in terms of the way Judge Real handled the case, because his original summary judgment order granting the case was very, it was very summary, you know, was not as detailed a finding as the Ninth Circuit, as this court would have liked. Well, I'm having real trouble understanding what you're saying. Forgive me. If this court says we find that the failure of the first judge in failing to give a hearing and argument to wrong, and so we're sending it back to a different judge, so that he can give it a hearing and argument. That's not a mandate to the new judge that he has to give a hearing and argument? Well, it might be. I'm looking at the... court's decision, as we're talking here, and it says, about the benefit of a hearing or oral argument raises doubts as to the care with which Milla's claims were examined. But, you know, I think if you look at the district, the new district courts, Judge Wilson's new order, it shows that he handled the case with care. He goes through the facts, he cites to case law, he cites to the record. I mean, so I think this court can consider on the merits, whether summary judgment was properly granted or not, because I think there's no dispute that the prosecutorial, prosecutorial independence prong is a separate, is a completely separate issue than what was what the Ninth Circuit decided in the first go-around. Can I jump in? So, all right, let's, maybe if we can move past this issue and just talk about the merits. I would like to hear your response to the point about the identifications. That obviously was, is kind of front and center in terms of the problematic part of this case. What I heard your, Judge Rakoff and your opponent articulating was more a theory of perhaps this identification by, was it Jenkins? Was that the key witness? Correct. It was actually fabricated, not just that there was some failure to convey the details, all of the details to the DA, but rather that the idea was just fabricated. And there's at least a jury question on that. If that's true, then the independence of the prosecutor's judgment, that doesn't even come into play, because that's one of the ways you rebut that issue, at least on that issue, on that question. No, Your Honors, and this is why. So, I anticipated this. This is, so, you're right. The, so, this is what, so, right. So, for prosecutorial independence to be rebutted, there has to be fabrication or misleading or what have you. But let's look at what the, what the district attorney had. So, when, when the district attorney, what, what, what the district attorney had regarding Ramar Jenkins' identification in, in the follow-up report, the, the detectives say that Ramar Jenkins made a positive identification of Mila, the guy in the number two spot, which is Mila. Um, but what, what, but that's, so, so there's a couple things. First of all, it's consistent with what Ramar Jenkins wrote in his photo, handwritten photo identification. He says the guy in the number two spot is the shooter. He doesn't, there's no qualifications, there's no tentativeness as there was with some of the other witnesses in terms of how they were had. They, they also had, what the district attorney also had when it made its decision, it also had the chronologue and it also had Detective Vanderhoek's handwritten notes. And in Detective Vanderhoek's handwritten notes, it says, it says regarding Jenkins, he says it's the notes where Ramar Jenkins describes the structures or the features that are similar or not similar. What does it mean? I noticed that funny notation. What does it mean that it's certain but not positive? Isn't that on its face inconsistent? Well, I think the way the detectives interpreted it, and if you look at this in their deposition, they both say that, um, I think it was Vanderhoek that talked about it, that he, he thought that Jenkins was sort of talking out loud to himself, sort of like looking at it going, Hmm, I think so. I'm certain this is it. Well, maybe I'm not positive. But this, this facial feature looks the same. This is the same. This might be different. The nose looks the same, whatever. And then he comes to that. I'm positive. That's the guy. So maybe Vanderhoek misinterpreted what was happening, or Jenkins thought process, but he didn't do it intentionally or to mislead. And so then, so then you have, and then you have not only that you have the handwritten statement by Jenkins in photo identification, where he says, he's positive that that it's positive, he's making a positive identification where there's no tentativeness. And to go to Mr. Stanley's points about the tape of the interview, he says, Mr. Stanley incorrectly says that we threw out the tape, we erase the tape, that is absolutely not what happened. What happened was the first tape was muffled, it didn't tape record. Well, they couldn't get the sound. Whatever, but you can hear you can hear things on the tape. But it's just you cannot clearly understand what is what people are saying. So they go back, they redo, they redo the interview. But but forgive me, but they don't redo the interview. Instead, what they do is they record an interview where they give him highly leading questions, which had they done that the first time round. This court would be saying that's on its face, a gross abuse. It's like at what the Supreme Court and other courts have taken up repeatedly where a policeman says, Now, look at number two, you're certain that's the guy, right? Right. And that would be it. So that's what they did in effect on the second interview. Yes. I mean, the words are what they are. So I'm not going to try to mischaracterize, you know, to recharacterize what we can all see in black and white. However, what I would say is this, the court also had it and certainly in the first identification, but I think some of the witness interview statements, or the tape recorded, the transcripts of the tape recorded interviews are in this are on this record as well. And I don't have all the sites. But I know, for example, when I was looking through everything last night, I saw Ms. Hightower's tape recorded statement, you know, the transcript of her tape recorded interview. And I would just say that in those cases, it doesn't show the officers, the detectives asking those kinds of leading questions. So I think one can infer that they're not going to just all of a sudden, would just with Bramar Jenkins is the only witness go, Oh, it's the guy in the number two slot, right? Yeah, okay. But Councilman in any of the other cases, so why would they suddenly do it in this case? Because they have no case without they have nobody who makes a positive identification other than Jenkins. That's the problem. They have no case they can even, you know, plausibly present to the DA without at least this one witness. But But my point to you is not I'm you're right. There's one that's one interpretation of the evidence. But isn't this a jury question? Ultimately? That's all I'm that's my only point to you. No, and I don't I don't think so. Because, because to, to say that the DA to cut off the prosecutorial independence avenue, you have to show that the the, that the detectives were deliberately falsifying, deliberately misleading, deliberately omitting, and you don't have anything like that, or did somehow other deliberately committing misconduct, that would be a sort of fraud on the court, you know, to mislead the court, and you don't have that you have the DA had the handwritten Detective van der Horst handwritten notes, that sort of that have that process. But if that if that handwritten note, though, were a product of the hypothetical set of questions that Judge Rakoff described, and the detectives didn't reveal to the DA that that's how it was produced, then of course, the presumption of independence would be rebutted. And that's what I'm saying that maybe you're right, maybe a jury would would hear all the evidence and say, Oh, no, we believe that these were good detectives, and that they did the same thing through for all of the witnesses. But But hasn't there at least been a jury question raised as well, maybe they deviated from it, because there's this weird thing with the tape. And you know, who knows? No, because, because you have the because, because you have, because van der Horst handwritten notes were presented, and the handwritten notes go through that certain not positive. Now, I'm sorry, from the first interview. Right. So, so, so, yeah, but I understand. But But the point I think that is, Judge Watford is trying to get at is this. You, the detectives interview a whole bunch of people, and no one is making a identification. And finally, they get to someone who even taking those notes on their face, gives seemingly inconsistent statements, he's certain, but he's not positive. And one in the normal course, would want to know exactly what he said, and you would listen to the tape. But they don't do that. They say, Oh, the tapes no good, it's muffled. We'll go back and redo it. But they don't redo it. When they redo it, they give totally leading questions. So why couldn't a jury taking everything most favorably to the plaintiff, infer that they were purposely deceptively, improperly trying to shore up his identification, so that when they presented to the DA, they could say, Oh, yeah, we've got a guy who says he's positive. It's that guy. Because you have, because the DA had that information, the DA had Vanderhoek's notes available to him. That said certain not positives. Now I'm certain. And then the DA also had the 900 page murder book. Is that what you're talking about? It was in the murder book. And I don't. And at that point, I don't think the murder book was 900 pages, because they were still sort of early on in the investigation. That's good, because I often ask my law clerks to look through 900 pages in an hour. I'm glad to know that the results are reliable. So anyway, sorry about that. Counselor, you're not saying that the murder book was considered by the prosecutor before making the charging decision, are you? I am because the I am saying that because the in the cases where the where they said there was no prosecutorial independence, all the prosecutor was given was the police report that had the, you know, the detectives interpretation of what happened. But in this case, that did not happen. You had the the district attorney, they gave the district attorney all of the photographs, all of the photographic identifications. They gave they they they also had all of the handwritten notes in there. They also they had all of that stuff. They had the chronologue. And in the follow up report. But the issue is what did the DA review, actually? So what does the record reflect regarding what the DA reviewed before making the charging decision? Well, that's that's not clear. Well, why isn't that a jury question, then? Because to to show prosecutorial to rebut the presumption, there has to be some showing that there's fraud, suppression, misleading. And if it did, or that the only thing that the prosecutor had access to was a police report that by itself was totally misleading or what have you. But didn't the district court rely on the fact that the murder book was presented? I'm sorry, can the district court rely on the fact that the chronologue and the murder book was presented to the DA? Yes, but didn't doesn't doesn't it matter whether or not the DA actually looked at those? I think for purposes of whether the these detectives have liability, or whether, you know, it's enough to break the causation. I don't think it does. Because I think the whole issue is whether or not the issue is what did the prosecutor have access to? Not what the process had access to. The question is whether or not the prosecutor's judgment was improperly influenced by the detect, the detective so that it wasn't independent. That's the whole inquiry, whether or not there was independent judgment on the part of the prosecutor, or whether or not the prosecutor was, the prosecutor's decision was actually impermissibly influenced by misrepresentations or intentional omissions by the detectives. That's the question that we ultimately have to get to. And to me, it's difficult to answer that relied upon. Well, I think in the cases that show that there was prosecutorial, that that it did not break the chain, though, in those cases, it was important that the court was talking about what the what the prosecutor had access to. So, for example, Baronda versus, you know, Barlow versus Brown, I think Baronda versus Richmond, it was the prosecutor only had access to the police reports, which by themselves were misleading. And in this case, you do not have that because in this case, you have the prosecutor had all the photo identifications, it had Vanderwerks notes, it had the it had the warrant application, which also sort of describes some of the discrepancies between the different witnesses descriptions of what the shooter looked like. The follow up report itself describes the discrepancies in everybody's descriptions of what the shooter looked like. So the so to say so that I think that's why you can say that it is an undisputed fact that it doesn't break the prosecutorial chain of independence. All right. Any other questions for the city? Thank you, counsel. You've exceeded your time. Rebuttal. Thank you. Thank you, Your Honors. May it please the court. First of all, there's a few facts that I want to the filing deputy. It was taken back. So to say what was reviewed or what was not reviewed and what was left with the filing deputy, not the murder book was undoubtedly by deposition testimony of both of the detectives taken back. The tapes which have this leading questions within them was not presented. They admit that at deposition. Now, yes, it was muffled. Maybe, maybe not. I know on our side, we never got that tape because it did not exist. A part that was muffled. Either they went over it or something else. They never gave us the muffled tape. So that could be might not be. But that was not turned over. Now, the fact of the matter is those photo lineups where he's pushing. Aren't you certain it's him, et cetera? There was only one person with a scar on his face. That was our client. No one else with a scar was in that photo after what happened here is after this is after they already had shown photos prior when he was younger, where remark Jenkins, the same guy said it wasn't him. So the summary of the of the investigation was presented to the D.A. Also, that didn't even mention the alibi. It says Velarde said he didn't do it. And Mia said he didn't do it. It doesn't say that they were together. That was not presented in the summary that was presented to the D.A. in the summary documentation. Now, the notes by Mr. Vanderhoek, it's interesting because the internal invest review by the district attorney's office states the following quote, the memorandum, Detective Ali, the investigating officer. This is what happened at trial initially testified at trial that Jenkins when Jenkins was first shown card E. Jenkins immediately identified Mia and said he was the shooter. However, when Detective Ali's memory was refreshed by reading his partner's officer's notes, that's Vanderhoek. Detective Ali recalled Jenkins was the first was first said the person in slot number two looks most like the shooter out of all the displayed photographs. That's what the D.A.'s office found in its investigation. Subsequently, in the habeas corpus petition, that's on page 10 of our summary brief. It's in volume three. I don't have the exact page to the appendix. I only have a couple of seconds, so I apologize. Well, you're over your time, so could you wrap up, please? Sure. If you look at page 10 and 11 of our supplemental brief, which was presented, also talks about remarking unequivocally identified me in the six pack, but in a statement on the photo identification report, it's not quite accurate and misleading is what the D.A.'s office said. The investigation officer notes of the photo show up indicate that when remark Jenkins saw me a six pack, he said Mia looks most like the shooter out of all of them. On an earlier occasion, the 16 pack, Mia was not identified. In the third six pack, Jenkins indicated it was an individual look like the shooter. So there's a lot of conflict here, a lot of questions that were not answered by the district court below. And again, the bottom line is we weren't even given a hearing. Of course, we would have taken the deposition of Carboha if we thought that that was something that might come up. We're not foolish. We try to be good lawyers. But at the same time, you can't respectfully on this record in cases like Caldwell and Paulus, which is another case we cited. Respectfully, we feel it would be wrong to affirm this. And we would suggest because we didn't even get the hearing that the court consider, unfortunately, I hate to do this, consider transferring it again to a different judge. Thank you, counsel. Thank you to both counsel for your helpful argument in this challenging case. The case just argued is submitted for decision by the court that completes our calendar for the day and for the week. We are adjourned.
judges: RAWLINSON, WATFORD, Rakoff